In the

# United States Court of Appeals
## For the Seventh Circuit

No. 02-1073

HARTMARX CORPORATION,

*Plaintiff-Appellee,*

*v.*

A. ROBERT ABBOUD, SPENCER HAYS,
TOM JAMES COMPANY, et al.,

*Defendants-Appellants.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 01 C 6942—**Milton I. Shadur**, *Judge.*

ARGUED SEPTEMBER 23, 2002—DECIDED APRIL 9, 2003

Before DIANE P. WOOD, EVANS, and WILLIAMS, *Circuit Judges.*

DIANE P. WOOD, *Circuit Judge.* This case concerns an abortive effort by one group of investors, collectively known as the Lincoln Company, to acquire Hartmarx Corporation (Hartmarx). Shortly after Lincoln publicly announced its intention to pursue an acquisition, Hartmarx filed suit, claiming that Lincoln had violated § 14(e) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(e), by failing to commence its anticipated tender offer within a reasonable period of time and by making false and misleading statements concerning their financing for the proposed deal.

Ugly litigation ensued, with denials, cross-claims, and a string of publicly released letters.

Lincoln ultimately terminated its acquisition efforts, but the litigation continued. Without finding liability under § 14(e), the district court conditioned dismissal of the action on Lincoln's issuance of a "corrective release" concerning the alleged misstatements. On its second try, Lincoln complied with that order, and the action was dismissed. Relying on the 1995 Private Securities Litigation Reform Act (PSLRA), 15 U.S.C. § 78u-4(c)(3), which incorporates FED. R. CIV. P. 11, the district court then imposed sanctions against Lincoln in the amount of $99,264 for the alleged misrepresentations and for bringing frivolous counterclaims. Lincoln now appeals that award. We conclude that Lincoln's statements and actions did not run so far afoul of the governing standards under the tender offer rules that sanctions were warranted. We therefore reverse that order and remand for correction of the judgment.

**I**

On August 13, 2001, a group including the Tom James Company, its chairman Spencer Hays, and A. Robert Abboud, a former director of Hartmarx, which together had created the Lincoln Company as a vehicle for their investments, sent a public letter to the directors of Hartmarx stating an intention to execute a future cash tender offer for all of Hartmarx's outstanding stock beyond the 5% it already owned. In that letter, Lincoln stated, "The Lincoln Company, LLC, which is the investor group we have assembled, is made up of The Tom James Company and other investors, who have committed $70 million in cash equity for this transaction." Lincoln then added that "we have arranged financing to cover the purchase, refinance the

existing Hartmarx debt and provide for the working capital needs of the Company." The press release was simultaneously filed with the Securities and Exchange Commission (SEC) on a Schedule TO form.

With its stock price rising, Hartmarx refused to meet with Lincoln's representatives and instead issued its own public letter, dated August 14, demanding details of Lincoln's financing. Lincoln responded by public letter on August 22 proposing that a confidentiality agreement should be executed before financing details could be provided. Hartmarx offered a written proposal for such an agreement, but the parties were unable to agree on the details. In a September 7 press release, Hartmarx declared that it would not meet with Lincoln because Lincoln was being too "secretive."

That same day, Hartmarx filed suit claiming that Lincoln's conduct violated § 14(e) of the 1934 Act. Among other things, Hartmarx alleged that Lincoln had violated § 14(e) by failing to commence its proposed tender offer within a "reasonable period of time" of the August 13 release and by making false and misleading statements in the release and the corresponding Schedule TO concerning its supposed financing for the deal and its intent to proceed with an offer. Hartmarx's complaint requested the issuance of a corrective press release stating that "defendants do not presently have [the necessary] financing commitments" to complete the offer, an injunction preventing Lincoln from proceeding with a tender offer until such corrections had been made, and an order that Lincoln had to commence any tender offer by a time specified by the district court.

Lincoln filed its answer on September 13. It claimed that neither the press release nor the Schedule TO communicated any intent to commence a tender offer. Furthermore, it asserted that the August 13 communication did not

constitute an actual tender offer at all under SEC Rule 14e-8. Lincoln also denied Hartmarx's allegation that it had not arranged financing for the deal. Finally, it filed counterclaims and a third-party complaint against Hartmarx and certain of its directors, claiming breach of state-law fiduciary duties and misrepresentation under § 14(e) for claiming that Lincoln lacked financing.

On September 17, Hartmarx moved for judgment on the pleadings. Lincoln responded in two ways. First, it provided Hartmarx's counsel with a number of letters providing further details about its financing arrangements, which showed a mix of written and oral commitments including $175 million from Bank of America, $35 million of equity and $45 million of debt from Stephens Group, and $35 million of equity from Tom James Company and Abboud. Two days later, Lincoln filed an amended answer and counterclaim. At that point, it said that "[w]hile the form of the ultimate transaction may change to include a cash merger or other mechanism, it has been and continues to be Lincoln's intent to commence and complete a tender offer" under certain conditions. It also claimed that it had proper financing for such an offer. The conditions to which it referred included regulatory approval and the Hartmarx Board's retraction of a poison pill defense mechanism. Lincoln deleted its defense that the August 13 press release did not constitute a tender offer under SEC Rule 14e-8.

At a September 19 hearing, the court held that Lincoln's amended pleadings rendered moot Hartmarx's motion for judgment on the pleadings. The court added, however, that Lincoln's earlier admissions, while fully superseded by the amended pleadings, still constituted evidentiary admissions. Both parties indicated their intention to file a motion for summary judgment.

On September 25, Hartmarx filed its written motion for summary judgment. That motion argued that the financ-

ing details provided by Lincoln conclusively showed that Lincoln's August 13 release contained misrepresentations about its financing arrangements—principally, that they were securely in place when they were not—and that Lincoln had acted knowingly or recklessly in issuing public statements. For instance, the Bank of America financing letter was dated September 7, 2001, some 25 days after the tender offer announcement, but Lincoln did not execute it until September 14. The Stephens Group financing letter was dated September 14, some 32 days after the tender offer, and Lincoln had not yet executed it. Lincoln, despite its statement at the September 19 hearing, chose not to file its own motion for summary judgment. Instead, it publicly revealed the source documents evidencing its financing agreements. (These documents had been delivered to Hartmarx on September 17 under a protective order.) Lincoln also publicly stated that if Hartmarx would not consent to a meeting by October 1, it would cease all acquisition efforts.

On September 28, Hartmarx moved separately to dismiss Lincoln's counterclaims, including the § 14(e) claims for Hartmarx's alleged misrepresentations about Lincoln's supposed lack of financing. Hartmarx did not address the merits of the state-law fiduciary duty claims. It argued instead that the district court should decline to exercise supplemental jurisdiction because of pending actions in Delaware Chancery Court.

Lincoln made good on its threat to withdraw its offer on October 1, but proceedings nonetheless continued in the district court. This prompted Lincoln to file a motion to dismiss for mootness on October 2, in which it offered to dismiss its own counterclaims in return for Hartmarx's dismissal of its claims. At an October 4 hearing, the district court expressed the opinion that the documents indicated that the August 13 press release contained misrepresentations as to financing. Moreover, the district

court said that even Lincoln's mootness motion contained untruthful or misleading statements about the state of Lincoln's financing throughout the contest. As a result, the district court denied Lincoln's motion to dismiss and ordered Lincoln to cure its misstatements as a service to still-pending lawsuits in other jurisdictions, most notably Delaware.

Lincoln complied with the court's order and issued a new press release on October 15 acknowledging that at the time of the August 13 press release it had only oral agreements for financing from the Tom James Company and A. Robert Abboud, "oral indications" from the KPS Special Situation Fund and the Stephens Group, and an unexecuted commitment letter from SunTrust Capital Markets, Inc. It indicated that it had also engaged in preliminary discussions with Bank of America, though a commitment letter was not drafted until after the August 13 release. Lincoln conceded that its financing arrangements "did not expressly provide for the acquisition of Hartmarx through a tender offer," and further characterized the entire contest as more of a negotiated acquisition that, with appropriate financing arrangements, might have ultimately taken the form of a tender offer. Upon publication of the October 15 corrective release, the district court dismissed the action.

On October 24, Hartmarx filed a motion for attorneys' fees and costs, relying as we noted before on the PSLRA's incorporation of Rule 11. (For convenience, we refer below to Rule 11 directly, as there is no indication that the PSLRA modified the rule in any relevant respect.) Hartmarx sought recovery for costs related to four different pleadings: (1) its September 17 motion for judgment on the pleadings, which had been "torpedoed" by Lincoln's "flip-flop" on the question whether the initial announcement contemplated a tender offer; (2) its September 25 motion for summary judgment, which it said was necessitated by

Lincoln's alleged mistruths about the status of its financing as of August 13; (3) its September 28 motion to dismiss Lincoln's counterclaims, which it claimed was also necessitated by Lincoln's alleged misrepresentations about financing; and (4) its opposition to Lincoln's October 2 motion to dismiss for mootness after Lincoln's public withdrawal of the tender offer. After several hearings and supplemental briefings, the district court imposed sanctions under the PSLRA and Rule 11, awarding Hartmarx fees and costs totaling $99,264, imposed jointly and severally on Lincoln and its attorneys. This appeal followed.

## II

Our review of a district court's grant of Rule 11 sanctions is for abuse of discretion. See *Cooter & Gell v. Hartmarx Corp.,* 496 U.S. 384, 405 (1990); *Finance Inv. Co. (Bermuda) Ltd. v. Geberit AG*, 165 F.3d 526, 530 (7th Cir. 1998). We therefore will apply that standard of review to the PSLRA sanctions imposed here. Whether examined under the PSLRA or Rule 11 directly, "[a] district court would necessarily abuse its discretion if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence." *Cooter & Gell*, 496 U.S. at 405. In exercising its discretion, a district court must also bear in mind that such sanctions are to be imposed sparingly, as they can "have significant impact beyond the merits of the individual case" and can affect the reputation and creativity of counsel. *Pacific Dunlop Holdings, Inc. v. Barosh*, 22 F.3d 113, 118 (7th Cir. 1994).

Lincoln's principal contention in this appeal is that the sanctions order rested on a fundamentally incorrect view of the way the tender offer process is designed to operate. Much of the confusion on all sides here stems from the SEC's relatively recent adoption of a broad package of

amendments to the rules governing tender and exchange offers, mergers, and other business combinations under the Securities Act of 1933 and the Securities Exchange Act of 1934. The new rules were promulgated by the Commission in a release entitled "Final Rule: Regulation of Takeovers and Security Holder Communications." See Exchange Act Release No. 33-7760; 34-42055; IC-24 107 (October 22, 1999) ["M&A Release"]. The amendments fundamentally overhauled the regulatory framework governing business combinations. They were intended to achieve a number of broad goals, including harmonizing the regulations governing tender offers with the rules pertaining to other kinds of business combinations; increasing the flow of information to shareholders and other market players; and minimizing regulatory tension particularly with SEC Rule 10b-5 and other parts of the securities laws. Importantly, the new rules became effective on January 24, 2000, well before the acquisition attempt beginning in August 2001 that spawned this case.

Two of the changes made by the M&A Release are especially important for our purposes. First, the new rules permit free communication with security holders beginning with the first public announcement of the transaction so long as the materials that relate to a tender offer are published with the Commission upon first use. Under the new rules, a "public announcement" is "any oral or written communication by the bidder, or any person authorized to act on the bidder's behalf, that is reasonably designed to, or has the effect of, informing the public or security holders in general about the tender offer." 17 C.F.R. § 240.14d-2 (explanatory note 5). "Commencement" is not triggered until a bidder "has first published, sent or given the means to tender to security holders." *Id*. at § 240.14d-2(a). By allowing oral and written communications with security holders prior to extending a formal offer to purchase, the new rules substantially eliminate

existing restrictions on pre-commencement communications.

Second, the new rules abolish the requirement that a bidder must formally commence within five days of its announcement of the tender offer, and rely instead only on the general anti-fraud provisions of Rule 14e-8. That rule implements section 14(e) of the 1934 Act, which makes it unlawful for a person:

> to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances . . ., not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer.

15 U.S.C. § 78n(e). The relevant implementing regulations contained in Rule 14e-8 prohibit announcement of an offer if the bidder:

> (a) Is making the announcement of a potential tender offer without the intention to commence the offer within a reasonable time and complete the offer;

> (b) Intends, directly or indirectly, for the announcement to manipulate the market price of the stock of the bidder or subject company; or

> (c) Does not have the reasonable belief that the person will have the means to purchase securities to complete the offer.

17 C.F.R. § 240.14e-8. These new anti-fraud rules seek to balance the related policy goals of maximizing the flow of information prior to formal commencement of a tender offer, on the one hand, and the need to prevent fraudulent and misleading communications by market players with ulterior motives, on the other. The upshot is that a bidder is no longer required to commence a tender offer within a set period of time. Nevertheless, the buyer is

still forbidden to inject false or misleading information into the marketplace while the tender offer remains a possibility.

We turn first to the district court's imposition of sanctions against appellants on the basis of its conclusion that Lincoln lacked the requisite intent to complete a tender offer and a reasonable belief that it had the financial means to do so. Those were legitimate concerns, as a brief look at the first and third subsections of Rule 14e-8 shows. In support of its decision, the court pointed to Lincoln's repeated statements throughout the pleadings that it had "arranged" the necessary financing to carry out a business combination with Hartmarx. These statements, the court believed, amounted to misrepresentations of the true state of Lincoln's financing as of August 13. Lincoln's intransigence, the district court thought, justified an award of sanctions as compensation for expenses incurred in preparing both Hartmarx's September 25 motion for summary judgment and its September 28 motion to dismiss Lincoln's counterclaims.

Perhaps following the lead of the district court, the parties have approached this part of the case as if it turns on the meaning of the word "arranged"—how concrete did the arrangements have to be? Did the money have to be in the bank or were promises enough? How unconditional did those promises have to be? While this is interesting, we do not believe that the ultimate meaning of the word "arranged" should dictate the outcome here. The important fact for Rule 11 purposes is that this was a new rule. The debate between the parties involves a close question of law under this new regime. As such, as long as Lincoln was taking a reasonable legal position on the meaning of the rule, it should not be sanctioned even if the district court concluded that Hartmarx had the better reading.

In particular, the M&A Release readily acknowledged that Rule 14e-8's "reasonable belief" requirement was a slippery one and would probably be a locus of future litigation. See M&A Release at II.D.1. In an attempt to provide some guidance on what constitutes a "reasonable belief," the SEC noted in its release that "[a]lthough not required, a commitment letter or other evidence of financing ability (*e.g.*, funds on hand or an existing credit facility) would in most cases be adequate to satisfy the rule's requirement that the bidder have a reasonable belief that it can purchase the securities sought." *Id.* We read this language as stating that commitment letters are sufficient, but not necessary, to stave off attack under Rule 14e-8(c). See also Erica H. Steinberger, *et al.*, *Comprehensive M&A Reforms Reflect New Market Realities*, 1259 PLI/Corp 97, 120 (June 2001) [hereinafter "*M&A Reforms*"] (taking the position that the new rules are "not intended to alter how bidders legitimately finance their offers or require that financing be arranged or a commitment letter obtained in advance or immediately after commencement").

In light of this guidance from the SEC, we find it at least plausible that Lincoln's mix as of August 13 of oral "agreements" and "indications" from the Tom James Company, A. Robert Abboud, KPS Special Situation Fund, and Stephens Group, the unexecuted commitment letter from Suntrust, and preliminary financing discussions with Bank of America would be enough to establish an "existing credit facility" within the meaning of the SEC's interpretation of the rule. But that question is not before us, and so we do not wish to intimate a firm conclusion on the matter. For the moment, it is sufficient to note that, whatever linguistic analysis can be brought to bear on Lincoln's use of the word "arranged" in its August 13 announcement and subsequent pleadings, the SEC interpretation of the new regulatory rules specifically

contemplates the announcement of tender offers with something less than fully committed financing. In short, while we withhold judgment on whether Lincoln's statements ran afoul of Rule 14e-8, we have no trouble concluding that its legal position was "warranted by . . . a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law." FED. R. CIV. P. 11(b)(2).

The district court also sanctioned Lincoln for its September 13 statement in its Verified Counterclaim and Third-Party Complaint that the proposed business combination was not a formal tender offer. The court compared Lincoln's initial denial that the August 13 statement was a tender offer with its revised statements in both its September 19 amended answer and counterclaim and the October 15 corrective release that it instead sought a negotiated acquisition that might have ultimately taken the form of a tender offer. The district court saw the change in course in the amended answer as a deliberate attempt to undercut—or, in the district court's words, "torpedo"—Hartmarx's duly filed September 17 motion for judgment on the pleadings. This change in position, the district court thought, merited the award of sanctions for the expenses incurred by Hartmarx in preparing the "torpedoed" motion for judgment.

As an initial point, we should make it clear that we do not regard the statements Lincoln made as part of its October 15 corrective release as relevant to this issue. Those statements were made under the direction of the district court. In fact, the district court had specifically conditioned dismissal of the case on the issuance of the corrective release that comported with its view of the facts, and Lincoln's prior efforts to produce a corrective release had been rejected as unacceptable. Lincoln's compliance with the court's ruling merely reflected its acquiescence to the district court's ultimate determination

on the merits, not the way Lincoln's earlier arguments had to be evaluated for Rule 11 purposes.

Setting aside statements made in the corrective release, we believe that, as with Lincoln's alleged misrepresentation of its financing arrangements, the question whether Lincoln's alleged change in position violated Rule 14e-8 is open to interpretation under the new M&A rules and is therefore an inappropriate basis for Rule 11 sanctions. The district court seized upon Lincoln's statement in its initial counterclaim that "[t]he Offer is not a tender offer." But this statement is in fact a legally correct statement of the status of its acquisition efforts at that time under the revised definition of "commencement" as set forth in Rule 14d-2(a). Indeed, formal commencement of a tender offer would have required that Lincoln provide specific information on how shareholders could tender their shares. See 17 C.F.R. § 240.14d-2(a).

Further, Lincoln's hesitance to label its proposed combination a "tender offer" in the August 13 release and in its initial pleadings may be explicable as a legitimate tactical choice under the new regulatory framework. The SEC itself notes in its interpretation of the rules that some bidders "do not use the term 'tender offer' in their public announcement of a proposed business combination transaction in an attempt to avoid triggering application of Rule 14d-2." See M&A Release at II.D.1. Among other things, the triggering of Rule 14d-2 creates obligations on the part of the target, most notably Rule 14e-2's requirement that the subject company take a position on the offer within 10 days. Thus, while we do not wish to speculate about strategy, Lincoln may have preferred to avoid any suggestion that its offer was in fact a formal tender offer for tactical reasons that are specifically supported by the SEC's interpretation of the new regulatory framework.

We also believe that the allegedly contradictory positions adopted by Lincoln in its initial and amended pleadings are consistent with Lincoln's stated desire to pursue a "bear hug" approach to acquiring Hartmarx. The term denotes a situation in which a bidder proposes a negotiated merger or friendly tender offer and implicitly or explicitly suggests that the breakdown of negotiations may ultimately lead to a hostile takeover attempt or other unpleasant action. See Michael J. Kennedy, *The Business Judgment Syllogism—Premises Governing Board Activity*, 1316 PLI/Corp 285, 300 n.54 (June 2002); see also *Rowe v. Maremont Corp.*, 850 F.2d 1226, 1230 (7th Cir. 1988). For instance, Lincoln noted in its initial answer that it had filed the Schedule TO "formally [to] announce that it intended to pursue a business combination with Hartmarx in a form to be negotiated in good faith between the Lincoln Entities and Hartmarx." This statement is entirely consistent with its revised statement in the amended answer that "Lincoln intended, and intends, to commence and complete a tender offer upon satisfaction of the above conditions." Those conditions included regulatory approval and the Hartmarx Board's cancellation of its poison pill provision, the latter of which would have been unnecessary in the event of other forms of friendly, negotiated merger, or, more obviously, a hostile takeover attempt. Thus, the record supports Lincoln's contention that from the very beginning it contemplated a friendly, negotiated acquisition of Hartmarx by any of a number of possible means, including a friendly tender offer, with a hostile takeover attempt serving as a possible back-up plan in the event that negotiations stalled (or failed).

Here again, the SEC's M&A Release specifically supports such tactics. Indeed, the SEC rejected the suggestion made in some comments that the five-day rule be retained for hostile takeovers, but eliminated for negotiated transactions, noting that "applying the rule only to

hostile offers could present problems when the same target is the subject of both a negotiated transaction and a hostile offer, or when a negotiated transaction becomes hostile as a result of changed circumstances or another offer." See M&A Release at II.D.1; see also Steinberger, *M&A Reforms*, at 105.

Finally, it is important to note that the "partial admission" by Lincoln on which the district court relied came in its counterclaim, not in its answer. Given that Lincoln was bringing counterclaims under § 14(e), the actual statement was not a denial of an allegation, but rather an effort to justify a claim brought under Rule 14e-8 against a target. The full statement reads:

> The Offer is not a tender offer. Hartmarx, however, is acting in anticipation of a tender offer or a request or invitation for tenders, and is therefore subject to the strictures of Section 14(e) of the Exchange Act.

This statement contains at least three elements: first, a correct description of the status of Lincoln's offer as of August 13 under the definition of "commencement" contained in Rule 14d-2(a); second, an acknowledgment that Lincoln was pursuing a "bear hug" acquisition that might or might not lead to a tender offer; and third, an admission that both its statements and those of Hartmarx were subject to Rule 14e-8's restrictions because of the possibility that negotiations might lead to a tender offer, whether friendly or hostile in nature. Of course, Hartmarx could and did point to these statements in making the argument that Lincoln lacked the requisite intent or means to commence a tender offer under 14e-8. But we find that all three are at the very least legally plausible positions under existing law, and so we conclude that there was no blatant "flip-flop" that might have justified Rule 11 sanctions.

We turn finally to the district court's award of sanctions for costs incurred in responding to Lincoln's filing of a

motion for mootness. Here, under established principles of justiciability doctrine, Lincoln's withdrawal of its tender offer on October 1 rendered moot both sides' claims under § 14(e). Indeed, because both parties' claims sought injunctive relief only, the district court could properly have continued to exercise jurisdiction only upon finding that the alleged infractions of Rule 14e-8 were "capable of repetition, yet evading review." See, *e.g.*, *City of Los Angeles v. Lyons*, 461 U.S. 95, 109-10 (1983); *Knox v. McGinnis,* 998 F.2d 1405, 1413 (7th Cir. 1993); see also *Southmark Prime Plus, L.P. v. Falzone*, 776 F. Supp. 888, 900 (D. Del. 1991). In short, Lincoln's position that the case was moot was correct, and accordingly it cannot serve as a basis for the imposition of Rule 11 sanctions.

Hartmarx argues in response that Lincoln's October 1 withdrawal of its offer was a further violation of § 14(e) because the press release that finalized the withdrawal continued to perpetrate misrepresentations as to the state of Lincoln's financing on August 13. But it is unclear why this should matter for purposes of a claim focused on the tender offer process. If adopted, this position would in effect grant Hartmarx an abstract right under § 14(e) to cleanse the public record even after the underlying tender offer to which Rule 14e-8's anti-fraud rules attach has been withdrawn. We decline the invitation to read § 14(e) and the rule this expansively.

Hartmarx further argues that allowing yet another "objectively false" press release to go uncorrected would have resulted in prejudice to Hartmarx in its continuing litigation efforts in Delaware state court. There are at least two problems with this argument. First, no one can invoke issue preclusion based upon this litigation, for the simple reason that the district court never reached the merits of Hartmarx's § 14(e) case and thus no issues were actually litigated. See *Parklane Hosiery v. Shore*, 439 U.S. 322, 326 n.5 (1979); *Loeb Indus., Inc. v. Sumitomo Corp.*,

306 F.3d 469, 496 (7th Cir. 2002); *People Who Care v. Rockford Bd. of Educ.*, 68 F.3d 172, 178 (7th Cir. 1995). Further, we are confident that the state courts in Delaware and elsewhere are able to sort through the issues on their own. See *Michigan v. Long*, 463 U.S. 1032, 1040 (1983); *Younger v. Harris*, 401 U.S. 37, 43 (1971). Hartmarx's position amounts to the argument that, though the Delaware courts had before them many of the same facts as did the district court, they would somehow be duped by Lincoln's October 1 release without federal court guidance on the matter. We will not make such an assumption.

### III

Because the district court's imposition of sanctions against appellants did not take into account the changes in the regulatory regime governing tender offers, we conclude that it was an abuse of discretion to order them here. The judgment of the district court is therefore REVERSED.

Accordingly, we also DENY Hartmarx's Rule 38 motion for attorneys' fees and double costs on appeal.

A true Copy:

      Teste:

 

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*